IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROHM AND HAAS TEXAS INC. § | |
| § | |
| v. § | |
| § | CIVIL ACTION NO. 4:21-cv-00882 |
| NSK CORPORATION; NSK LTD.; § | |
| and APPLIED INDUSTRIAL § | |
| TECHNOLOGIES, INC. § | |

## ORIGINAL COMPLAINT

Plaintiff Rohm and Haas Texas Incorporated respectfully files this Original Complaint and would show the Court as follows:

## THE PARTIES

1. Plaintiff Rohm and Haas Texas Incorporated ("Rohm and Haas Texas") is a Texas corporation whose principal address is at 1900 Tidal Road, P.O. Box 1000, Deer Park, TX 77536.

2. Defendant NSK Corporation ("NSK Corp.") is a foreign corporation located at 4200 Goss Road, Ann Arbor, MI 48105. NSK Corp. is incorporated under the laws of the State of Delaware, has its principal place of business in Michigan, and may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701. The Court had specific personal jurisdiction over NSK Corp. because it is manufacturer, seller, or distributor of a product that caused or contributed to the events that give rise to Rohm and Haas Texas' claims.

3. NSK, Ltd. ("NSK Ltd.") is a foreign business entity located at the Nissei Building, 1-6-3 Ohsaki, Shinagawa-Ku, Tokyo, 141-8560, Japan. For these reasons, service of process is to be made pursuant to FED. R. C. P. 4(f), by and through the *Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, done at The

Hague, November 15, 1965. 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. Said documents are to be forwarded to the Central Authority of Japan as required by The Hague Convention, to wit: Hague Convention Division, Consular Affairs Bureau Ministry of Foreign Affairs, 100-8919 Kasumigaseki 2-2-1, Chiyoda-ku, Tokyo, Japan. Plaintiff would further show that NSK, Ltd. engages in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in the State of Texas, and therefore, service of process is authorized under TEX. CIV. PRAC. & REM. CODE § 17.044(b) by serving the Secretary of State of Texas as agent for NSK, Ltd. The Court had specific personal jurisdiction over NSK Ltd. because it is manufacturer, seller, or distributor of a product that caused or contributed to the events that give rise to Rohm and Haas Texas' claims.

4. Defendant Applied Industrial Technologies, Inc. ("Applied") is a foreign corporation that is authorized to conduct business in the State of Texas. It may be served through its registered agent, Cogency Global, Inc., at 1601 Elm Street, Suite 4360, Dallas, TX 75201. Applied is organized under the laws of the State of Ohio and has its principal place of business at 1 Applied Plaza, Cleveland, OH 44115-5030. The Court had specific personal jurisdiction over Applied because it is seller or distributor of a product that caused or contributed to the events that give rise to Rohm and Haas Texas' claims.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction pursuant to 28 U.S.C. §1332 (a) because it is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interests, and it is between citizens of different states. Rohm and Haas Texas is a citizen of the State of Texas; NSK Corp.is a citizen of the State of Delaware and Michigan; NSK Ltd. is a citizen of Japan; and Applied is a citizen of the State of Ohio.

6. The Court has venue of this action in the Southern District of Texas pursuant to 28 U.S.C. § 1391 (b)(2) in that a substantial part of the events or omissions giving rise to Rohm and Haas Texas' claims occurred in the Southern District of Texas.

## FACTUAL BACKGROUND

7. **The Houston Ship Channel.** The Houston Ship Channel (the "HSC") is part of the Port of Houston (the "Port"), one of the busiest ports in the world, which connects vessels between its Houston-area terminals to the rest of the world. The HSC is a 52-mile federal waterway that handled more than 200 million short tons of international cargo in 2018, with an economic value is $801.9 billion dollars. The Port is ranked first in the United States for foreign waterborne tonnage, U.S. imports, U.S. export tonnage, and second in total tonnage. The Port is crucial to the petrochemical industry and is home to the largest petrochemical manufacturing complex in the Western Hemisphere.

8. **ITC Facility.** Intercontinental Terminal Co. ("ITC") Deer Park Terminal is a bulk liquid storage facility along the HSC located at 1943 Independence Parkway South, La Porte, Texas. It is approximately 265 acres, with 242 tanks with a storage capacity of 13.1 million barrels. The ITC Facility has five ship docks, ten barge docks, rail access and truck access, as well as multiple pipeline connections. The storage tanks were used to store petrochemical liquids and gases, fuel oil, bunker oil, and distillates.

9. **Rohm and Haas Texas**. Rohm and Haas Texas is a chemical manufacturing company also located in Deer Park that stored its chemicals at the ITC Deer Park Terminal. Rohm and Haas Texas has a contract with ITC for it to provide "terminal services" to the Deer Park plant.[1]

---

[1] The Master Terminalling Service Contract between Rohm and Haas Texas and ITC contains an arbitration clause, so Rohm and Haas Texas is filing an arbitration demand against ITC.

10. **The ITC Fire.** On March 16, 2019, a specific tank, Tank 80-8, at the ITC Facility received two butane[2] deliveries, the first beginning at around 7:23 pm and the second unloading between 9:29 pm and 10:29 pm. A ship was planned to arrive the following day to take Tank 80-8's contents. On the morning of that day, March 17, 2019, ITC data indicated some changes in the pump operating pressures and tank volumes, eventually including a recorded tank volume that decreased steadily, along with pump discharge pressure dropping; the tank volume decreased by approximately 221 barrels between 9:34 and 10:01 a.m. According to the U.S. Chemical Safety & Hazard Investigation Board ("CSB")'s factual update regarding the fire, because ITC's tanks were not equipped with a fixed gas detection system, no alarms were activated to warn ITC personnel of the release. Also, because Tank 80-8 was not equipped with an emergency or remotely operated isolation valves, the operator must manually close the supply valves.

11. At approximately 10:00 a.m. on March 17, 2019, a large fire erupted in Tank 80-8 (the "ITC Fire"). Because the valves on the piping had to be operated manually, emergency workers were unable to shut the piping system as the fire spread. According to the CSB's lead investigator, "[t]he leaks could not be controlled once the fire started." That tank was surrounded by several other 80,000 barrel storage tanks, and the fire spread, first to a tank west of Tank 80-8 and then to several additional tanks over the next two days. The tanks contained xylenes, base oil, gas blend stocks, toluene, and pygas. The uncontrolled ITC Fire created a dark emissions plume that was visible for miles, which lasted from March 17, 2019 until at least March 20, 2019, when the ITC Fire was extinguished in the early morning hours. According to information gathered by air monitoring stations, elevated levels of volatile organic compounds

---

[2] ITC injects butane into the naphtha product using the external piping and equipment to increase the octane level of the fuel product.

("VOCs") were detected since the ITC Fire's inception. In fact, self-reported emissions data posted on the Texas Commission on Environmental Quality ("TCEQ")'s website shows that the fire emitted more than 9 million pounds of pollutants into the air.

12. On March 22, 2019, a section of the ITC tank farm dike wall breached and released a mixture of chemicals from the tanks, water, and firefighting foam into Tucker Bayou, which flows directly into the HSC. This resulted in the release of toxic chemicals including xylene and benzene. That same day, three tanks reignited at about 3:45 p.m. and the ITC Fire spread to the liquid that had escaped through the containment wall. This fire was extinguished about an hour after it began.

13. During the multi-day ITC Fire, the local community was heavily impacted, including the business community dependent on the Port, as businesses struggled with shelter-in-place orders, and, most importantly here, closures of the Port itself. On Sunday, March 17, 2019, the Deer Park community was forced to shelter-in-place and Highway 225 was closed in both directions. A second shelter-in-place occurred on March 21, 2019 when there were new reports of volatile organic compounds in the atmosphere. On Friday, March 22, 2019, the US Coast Guard closed the HSC adjacent to the ITC Facility because of the breach of the containment wall. On March 23, 2019, the Lynchburg Ferry crossing closed because of the detection of levels of VOCs. According to local reporting by the *Houston Chronicle*, for three days, nearly half of the 52-mile HSC was cut off from the Gulf Coast Waterway. This disaster impacted the HSC for weeks. On March 28, 2019, a local article noted that traffic remained backed up, limited to transits during daylight hours only and then only one way at a time for large vessels.

14. Several agencies are investigating whether the ITC Fire could have been prevented. The CSHIB released a factual update on October 30, 2019. The CSHIB report, in

particular, questioned "why the naphtha product release was not detected prior to ignition and why the release was not isolated post-fire," as well as "why prolonged emergency response efforts were necessary to control and ultimately extinguish the fire." The Occupational Safety and Health Administration ("OSHA") issued four serious citations against ITC. ITC did not have a fire suppression system or have access to dry chemical fire suppression that might have quickly extinguished the blaze.

15. The business community was severely impacted during the ITC Fire and response. As the *Houston Chronicle* published, the closure could cost the energy industry a billion dollars, as several companies had to sit by while the fire raged, unable to be contained, then the second leak spilled into the HSC. Vopak, a storage facility immediately adjacent to ITC, has filed a lawsuit against ITC and claims that its facility was closed or significantly limited for nearly a month, and that "Vopak continued to experience periodic closures and inconsistent, rail, truck, and marine traffic as a result of safety concerns and cleanup operations for several weeks."

16. As detailed in many cases before this Court, prior to the ITC Fire, several regulatory agencies fined ITC for various environmental infractions. In 2008, the TCEQ fined ITC when 6,745 pounds of butadiene was released to the air; it agreed to pay $103,500 in civil penalties and attorney fees and signed a permanent injunction to avoid future violations of Texas air quality and water quality laws. In 2009, ITC was fined for releasing 1,452 pounds of toluene. TCEQ also fined ITC in 2017 for releasing cyanide into the San Jacinto River basin. According to a local news investigation, ITC paid more than $200,000 in air and water quality penalties and fees over the past dozen years.

17. As a result of these fires, Rohm and Haas Texas could neither retrieve raw materials at ITC nor unload raw materials from ships and barges at the ITC Terminal to route to Deer Park or ship finished product out. As a result, Rohm and Haas Texas incurred delay penalties, *e.g.*, demurrage, was forced to purchase raw materials on the spot market, and had to make other logistics arrangements to receive and ship product, including building terminal facilities at the Deer Park plant and shipping by less cost-effective methods, *e.g.*, truck. Also, certain units were forced to shut down for a few days for lack of raw materials or due to proximity to the ITC Fires.

18. **The Investigation.** After the incident, ITC conducted a root cause investigation ("RCI") into potential causes of the fire. That RCI found that, on December 4, 2018, ITC employees noticed that Tank 80-8's pump was unusually loud. A subsequent inspection of the pump determined that it needed new bearings. The pump was disassembled, and ITC's millwrights installed new NSK Model 5313 outboard bearings and NSK Model 6313 inboard bearings to support the pump's shaft. The remainder of the pump was then reassembled and then placed into operation in Tank 80-8.

19. On March 17, 2019, the NSK 5313 outboard bearing failed, causing vibrations within the impeller shaft that were directly transmitted to the mechanical shaft seal. This vibration loosened the bolted connections holding the mechanical shaft seal in place. Once the seal broke, the naphtha escaped into the area around the Tank 80-8 pump, where it ignited and caused the incident.

20. When the Tank 80-8 pump was taken apart to determine the cause of the incident, investigators observed that the outboard bearing (constructed using NSK 5313 bearings) had come apart, resulting in loose bearing balls and ball remnants in the bearing house, meaning that

at the time of the incident the outboard bearing was no longer capable of supporting the mechanical shaft centered in the bearing house. Most of these balls were severely deformed and/or fragmented.

21. A subsequent metallurgical examination revealed that the Model 5313 outward bearings contained unexplained internal voids, meaning they were not as durable as solid-core ball bearings and were more likely to fail. By contrast, the NSK 6313 inward bearings examined from the incident were solid throughout, as demonstrated by the below diagrams. Here's an example of what they found:



And what they should have found:



Upon information and belief, the design and specifications for the Model 5313 ball bearings did not call for internal voids, but instead called for solid core ball bearings. The internal voids were therefore a deviation from the intended specifications.

22. The NSK 5313 ball bearings were sold to ITC by Applied.

### FIRST CAUSE OF ACTION: MANUFACTURING DEFECT
### Against NSK Defendants

23. Rohm and Haas Texas re-alleges the preceding paragraphs as if fully set forth herein.

24. Defendants NSK Corp. and NSK Ltd. (collectively, "NSK Defendants") are engaged in the business of manufacturing and placing into the stream of commerce the NSK 5313 bearings that caused the incident that is the subject of this litigation. As such, the NSK Defendants are "manufacturer[s]" as that term is defined by Section 82.011(4) of the Texas Civil Practice & Remedies Code.

25. The NSK Defendants manufactured the NSK 5313 bearings and placed them into the stream of commerce with the expectation that those bearings would, and in fact did, reach the user or consumer without substantial change in the condition in which the bearings were sold.

26. A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

27. The NSK 5313 bearings, at the time they were placed into the stream of commerce by the NSK Defendants, were in a defective condition unreasonably dangerous to the end-user. Specifically, while the specification for the NSK 5313 bearings required that they contain a solid core, the bearings sold to ITC contained internal voids (i.e., they had a hollow core) of approximately 0.33 inches. These internal voids caused the bearings to have a smaller

diameter than would similar solid-core bearings, as well as an average mass of only 78% of the inboard bearing balls. This decreased size and mass caused the NSK 5313 ball bearings to deteriorate more quickly than if they had a solid core, causing them to fragment and come loose within the bearing.

## SECOND CAUSE OF ACTION:  DESIGN DEFECT
### Against NSK Defendants

28. Rohm and Haas Texas re-alleges the preceding paragraphs as if fully set forth herein.

29. In the alternative, to the extent that the NSK 5313 ball bearings did not deviate from their design specifications, the NSK Defendants are liable for Plaintiff's injuries because the design of the 5313 ball bearings was defective. To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which Plaintiff seeks recovery.

30. The failure of the outboard bearing, the vibration of the impeller shaft, the loosening of the mechanical shaft seal, and the release of Naphtha would not have occurred if the NSK 5313 ball bearings—like their NSK 6313 counterparts—were manufactured with a solid core in accordance with their design specifications. As such, this dangerous condition was a proximate cause of the March 17, 2019 explosion at ITC's Deer Park Facility and Plaintiff's injuries.

31. The NSK Defendants' design of the NSK Model 5313 ball bearing was defective because it contained "internal voids" that rendered the bearing unreasonably dangerous for its intended use. Rather than design the bearing with internal voids, the NSK Defendants should have utilized the solid-core design found in NSK Model 6313. That this "solid core" alternative

design is safer than the "internal void" design of the NSK 5313 ball bearing is demonstrated by the fact that the NSK 5313 bearings deteriorated and fragmented while the solid-core NSK 6313 bearings did not.

32. Similarly, the existence and utilization of the NSK 6313 ball bearings in the inboard bearing demonstrates that the solid core design is both technologically and economically feasible.

33. The "internal void" design was the producing cause of Plaintiff's injuries for the reasons discussed in paragraphs 18-22, *supra*. As such, the NSK Defendants are liable for Plaintiff's injuries.

### THIRD CAUSE OF ACTION: PRODUCTS LIABILITY
### Against Defendant Applied

34. Rohm and Haas Texas re-alleges the preceding paragraphs as if fully set forth herein.

35. A "seller" is defined as "a person who is engaged in the business of distributing or otherwise placing, for a commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof" pursuant to TEX. CIV. PRAC. & REM. CODE § 82.001(3).

36. As the distributors of the NSK Model 5313 ball bearings that were sold to and utilized by ITC, Applied is a "seller" as defined by the Texas Civil Practice and Remedies Code.

37. The Texas Civil Practice and Remedies Code states "[a] seller that did not manufacture a product" may be held liable in a products liability action for any harm caused by that product under certain circumstances. For example, if "the claimant proves …(a)(7) that the manufacturer of the product is…not subject to the jurisdiction of the court," then the nonmanufacturing distributor is liable under § 82.003(a)(7).

38. As such, in the event this Court is unable to exercise jurisdiction over the NSK Defendants, or if Plaintiff proves any other element of TEX. CIV. PRAC. & REM. CODE § 82.003, Applied is liable for Plaintiff's damages to the full extent that those damages resulted from NSK's defective manufacturing and design of the NSK Model 5313 bearings.

39. Further, to the extent that Applied was a seller that (1) participated in the design of the product; (2) altered or modified the product and the ITC Fire resulted from that alteration or modification; or (3) installed the product, or had the product installed, on another product and the ITC Fire resulted from the product's installation onto the assembled product, Applied is also a proximate cause of the March 17, 2019 explosion at ITC's Deer Park Facility and Plaintiff's damages pursuant to TEX. CIV. PRAC. & REM. CODE § 82.003.

## **DAMAGES**

40. The NSK Defendants' acts caused a huge disruption in Rohm and Haas Texas' businesses. For considerable time, Rohm and Haas Texas was unable to access the ITC Facility in order to store and distribute its products. Rohm and Haas Texas's losses included, but were not limited to, demurrage, inability to offload and distribute product, additional supply chain logistics damages, and costs in constructing and revising facilities. Rohm and Haas Texas was forced to build its own storage facility as a result of this fire.

41. Rohm and Haas Texas further incurred millions of dollars of losses in terms of lost sales, including, but not limited to, lost production, additional costs to purchase raw materials, and additional costs during the shut-down.

## **PRAYER**

WHEREFORE, Rohm and Haas Texas respectfully prays that upon trial or other final hearing that the Court enter a judgment awarding them the following relief:

(a) An award of all Rohm and Haas Texas' business damages as a result of the Defendants' conduct;

(b) An award of exemplary or punitive damages;

(c) pre- and post-judgment interest;

(d) costs of court; and

(e) any and all further relief to which they are entitled.

## **DEMAND FOR JURY TRIAL**

Plaintiff Rohm and Haas Texas Incorporated demands a trial by jury.

00243321.DOCX; 2

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By */s/ Michael L. Brem*
    Michael L. Brem
    State Bar No. 02952020
    SD. Texas Federal ID. No. 13175
    Pennzoil Place - South Tower
    711 Louisiana Street, Suite 1750
    Houston, Texas 77002
    Telephone: (713) 221-2500
    Facsimile: (713) 221-2525
    Email: mbrem@sdablaw.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF
ROHM AND HAAS TEXAS INCORPORATED**

OF COUNSEL:

Janet Guggemos Garza
State Bar No. 24032379
SD. Texas Federal ID. No. 30850
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – South Tower
711 Louisiana Street, Suite 1750
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 221-2525
Email: jgarza@sdablaw.com